AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Kansas

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  24-M-6074-01-BGS |
| The Premises and Devices at | ) | |
| 219 W 5th Street, Liberal, Kansas 67901, as further described in Attachment A | ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☐ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2251 | Sexual Exploitation of a Child |
| 18 U.S.C. 2252/2252A | Possession/Receipt/Distribution of Child Pornography |

The application is based on these facts:

See Attached Affidavit of Probable Cause.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Brittany A. Bayles, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  3/22/24

*Judge's signature*

City and state:  Wichita, KS

Brooks G. Severson, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| IN THE MATTER OF THE SEARCH OF | |
|---|---|
| The premises and devices located at 219 W 5th Street, Liberal, Kansas 67901 | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Brittany A. Bayles, Special Agent of the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I have been employed as a Special Agent of the FBI since February 2022. I am currently assigned to the FBI Kansas City Division, Wichita Resident Agency.  As a Special Agent of the FBI, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States, including violations of Title 18 United States Code §§ 2251, 2252, and 2252A. I have participated in a wide variety of criminal investigations, to include violent crime, crimes against children, human trafficking, major theft, and other federal crimes. I have participated in the preparation and execution of many search warrants, including, but not limited to, those involving the sexual exploitation of minors and certain activities relating to material constituting or containing child pornography.

2.     The information in this affidavit is information known to me as a result of my participation in this investigation or is information that has been communicated to me by other law enforcement investigators involved in this investigation. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included each and every fact known

to me concerning this investigation.  Instead, I have set forth only those facts that I believe are necessary to establish the existence of probable cause to support a search warrant.

3.    As will be shown below, there is probable cause to believe that the residence described in Attachment A will contain evidence of the sexual exploitation of a child, in violation of Title 18 United States Code § 2251, and the receipt of obscene visual representations of the sexual abuse of children and/or child pornography, in violation of Title 18 United States Code § 2252 and Title 18 United States Code § 2252A. I submit this application and affidavit in support of a search warrant authorizing the search of the residence described in Attachment A. I seek authorization to seize and examine evidence, fruits, and instrumentalities of the foregoing criminal violations, which relate to the aforementioned criminal violations, and as further described in Attachment B.

## INVESTIGATION/PROBABLE CAUSE

4.    On or about August 24, 2023, FBI Dallas Division-Lubbock Resident Agency (RA) received information from the Wisconsin Internet Crimes Against Children Unit (ICAC) regarding a subject believed to be residing in Abilene, Texas involved in the production and distribution of child sexual abuse material (CSAM) on the KIK Messenger[1] application.

5.    After further investigation, a federal search warrant was executed on or about August 28, 2023, on the residence in Abilene, Texas. During the search warrant, an interview was conducted with the subject (hereafter referred to as ABILENE).

_____

[1] Kik Messenger, commonly called Kik, is a freeware instant messaging mobile app from the Canadian company Kik Interactive, and available free of charge on iOS and Android operating systems.  It is a social networking application that permits a user to trade and disseminate various forms of digital media while using a cellphone.

2

6.      Information was provided from ABILENE that he was part of a "verified step-daughter" group on KIK and had recorded the sexual abuse of his 11 and 14 year old step-daughters on multiple occasions, including digitally penetrating the 14-year-old and ejaculating on her face while she was sleeping. ABILENE advised he recorded all of these sexual interactions with his phone as well as hidden cameras that he placed throughout his residence, including his step-daughters' bathrooms.

7.      During the search warrant in Texas, ABILENE's electronic devices were seized, and digital extractions were conducted of the electronic devices.

8.      During review of the digital extractions, a chat message conversation was discovered between ABILENE and an unknown male, later identified as Fred Lee Chatham (CHATHAM) on Threema[2]. The extraction presented the chat conversation in sequential order, without identifying the sender of the chat message. However, based upon the content (such as images sent by one user, references to family members or locations, etc.) in connection with other known aspects of ABILENE and CHATHAM respectively, your affiant has been able to discern attribution for following referenced conversations.[3]

9.      The chat conversation revealed the two users had a common acquaintance (apparently from the group), but still desired verification of who they were by sending photographs of themselves to each other. The following chat conversation and photographs were shared on

---

[2] Threema is an end-to-end encryption instant chat messaging platform that allows users to disguise their identity and keep their communications between them and the user with whom they are communicating.

[3] Even without definitive attribution, the communications plainly reveal that ABILENE was involved in communications with another user where images of child pornography were shared, and that there is probable cause to believe CHATHAM is the other involved users, such that CHATHAM's devices will include evidence associated with the aforementioned crimes..

3

January 16, 2023, between ABILENE and CHATHAM:

> CHATHAM: I'm good with that. What do you want to verify?

> ABILENE: Selfie pic of you flipping me off without your thumb out.
>> And a pic of you with your wife and step. On separate pics or in same pic. Your choice.
>> Ill do whatever ridiculous thing you want in selfie pic and send a clear pic of me with wife and step.
>> All must be clearly showing our faces so we know we are who we say we are..
>> I don't share like this with a lot of folks.. but the ones i do share with , I have to be able to trust they will not repost.
>> You tell me what selfie you want me to do.

> CHATHAM: No problem. I'll get that stuff for you tomorrow. Heading to bed
>> Might go check on step first

> ABILENE: Haha.. talk to show me.. if you have questions about me.. he says youre pretty straight

> CHATHAM: No we're good. I'll just have to gather some pics today.

ABILENE proceeded to send four photos to include one of him and his wife, one of himself flipping the camera off, one of him and his stepdaughter, and one of him, his wife, and step-daughter. CHATHAM replied with the following photographs, per ABILENE's request:

 

 

10.     In the conversation, ABILENE shared the following images and videos of his 11-
and 14-year-old step-daughters with CHATHAM:

a.     A video that is 1 minute and 39 seconds in length depicting ABILENE's 14-year-
old step-daughter in the shower with a towel wrapped around her body. The female
appears to be cleaning off the shower door with a squeegee and proceeds to unwrap
her towel and put it around her head. During this time, the female's breasts and
genital area are exposed. The video appears to be recorded from underneath the
bathroom door.

b.     A video that is 42 seconds in length depicting ABILENE's 14-year-old step-
daughter brushing her hair in the bathroom with no clothes on. The female's breasts
and genital area are exposed. The video appears to be recorded from outside a
bathroom window.

c.     A video that is 14 seconds in length depicting a male masturbating in front of
ABILENE's 14-year-old step-daughter. The male proceeds to ejaculate in the
female's mouth as she is sleeping.

d.     An image depicting a pubescent female in a bedroom with no clothes on and her
breasts exposed. The image appears to be taken from a hidden camera near floor-
level of the bedroom.

e.     A video that is 12 seconds in length depicting ABILENE's 11-year-old step-
daughter sitting on the bathroom floor with her legs spread apart and her genital
area exposed. The female is touching her genital area with her hands. The video
appears to be recording from outside the bathroom window.

5

f.    An image depicting ABILENE's 14-year-old step-daughter sleeping with only underwear on and her breasts exposed.

g.    An image depicting ABILENE's 14-year-old step-daughter sleeping with an erect penis near her mouth.

h.    An image depicting ABILENE's 11-year-old step-daughter standing in the bathroom with her breasts and genital area exposed. The image appears to have been taken from outside the bathroom window.

i.    An image depicting ABILENE's 11-year-old step-daughter in the bathroom with her breasts exposed.

j.    An image depicting ABILENE's 14-year-old step-daughter sleeping with an erect penis on her mouth.

k.    A video that is 23 seconds in length depicting a male masturbating to an image on the television. The image on the television depicts a pubescent female with a penis penetrating the female's vagina.

11.    CHATHAM shared multiple images and videos of his wife and him engaging in sexual conduct as well as obscene material of one of his step-daughters (described in subparagraphs 11a-11f). The videos and images of CHATHAM's step-daughter appeared to be recorded from a hidden device due to the angle of the camera in the bathroom. The following videos and images were sent to ABILENE from CHATHAM:

a.    A video that is 20 seconds in length depicting a female (step-daughter) appearing to be sitting on the toilet. The female proceeded to get off the toilet with her pants pulled down and turned on the shower. The female's buttocks and genitals were exposed in the video. The video bears a timestamp of December 25, 2022 at 8:46am. This timing, if correct, indicates the step-daughter was an adult at the time.

b.    A video that is 24 seconds in length depicting a female (step-daughter) undressing in the bathroom. The female's buttocks and genitals were exposed. The video bears a timestamp of December 25, 2022 at 9:48am. This timing, if correct, indicates the step-daughter was an adult at the time.

c.    A video that is 25 seconds in length depicting a female (step-daughter) undressing in the bathroom. The female's buttocks, breasts, and genitals were exposed. This video does not bear a timestamp, but the stepdaughter appears to be roughly the same age as in the videos in 11a and 11b.

6

d.   A side by side comparison image of a female (step-daughter). On the left side of the image the female was undressed in the bathroom with her genitals and breasts exposed. On the right side of the image the female (step-daughter) was fully dressed holding food in a kitchen. This video does not bear a timestamp, but the stepdaughter appears to be roughly the same age as in the videos in 11a and 11b.

e.   An image depicting a female (step-daughter) undressed in the bathroom with her breasts and genitals exposed. This video does not bear a timestamp, but the stepdaughter appears to be roughly the same age as in the videos in 11a and 11b.

f.   A video that is 48 seconds in length depicting a female (step-daughter) undressing in the bathroom. The female's buttocks, breasts, and genitals were exposed. This video does not bear a timestamp, but the stepdaughter appears to be roughly the same age as in the videos in 11a and 11b.

g.   An image of a female (wife) performing oral sex on a male.

h.   An image of a female (wife) exposing her breasts and genitals while kneeling on a bed.

i.   An image of a female (wife) using a device to sexually gratify herself on a bed.

j.   An image of a female (wife), another female (step-daughter), and a male together in a group outside.

k.   An image of a female (wife) in a bikini.

l.   An image of a female (step-daughter) and a dog.

m.   A video that is 1 minute and 58 seconds in length depicting a female (wife) undressing in the bedroom. The female's buttocks and breasts were exposed.

n.   A side by side comparison image of a female (wife). On the left side of the image the female was standing in the living room with a black dress on. On the right side of the image the female (wife) is standing in the bathroom with no clothes on. Her breasts and genitals are exposed.

o.   An image of a female (wife) sleeping with only a thong and tank top on. The image is taken from behind her.

p.   An image of a female (wife) with a provocative top and bottom on with her breasts and genitals exposed.

q.   An image of a female (wife) performing oral sex on a male.

12.   During these communications, CHATHAM also advised that his step-daughter was

7

14 years old when she started having sex. CHATHAM stated his step-daughter's boyfriend and he became friends.

13.     On or about March 5, 2024, Agents identified CHATHAM after discovering photographs (referenced in paragraph 9) that he had sent to ABILENE. Using a law enforcement facial recognition tool, the unknown male was identified as Fred Lee Chatham (CHATHAM), who resides at 219 W 5th Street, Liberal, Kansas 67901 (TARGET RESIDENCE).

14.     Further identification of CHATHAM occurred through multiple law enforcement database checks and open-source databases checks. For example, the following comparison match was located for CHATHAM's publicly available social media profiles:



15.     CHATHAM and ABILENE talked about their locations. For his part, CHATHAM told ABILENE that he was originally from Colorado. CHATHAM advised his headquarters is in Euless, Texas and is there every month for work. CHATHAM also stated his son lives in Rockwall. CHATHAM advised his youngest stepdaughter is 21-years-old and autistic. In a later conversation,

CHATHAM stated his other stepdaughter was 23-years-old and sent a photograph of her and a dog.

16.     On or about February 17, 2023, CHATHAM asked ABILENE if his first name was really Mike. CHATHAM sent a second message before ABILENE replied and stated, "Mine is Lee." Lee is the name CHATHAM goes by on social media as indicated in paragraph 14.

17.     Agents confirmed CHATHAM's son lives in Rockwall with his (son's) mother.

18.     Agents confirmed CHATHAM's wife has two daughters. One was born in 1999 and the other was born in 2001, consistent with the ages referenced by CHATHAM.

19.     It was also confirmed that CHATHAM, his wife, and two step-daughters are originally from Colorado. The two step-daughters currently live in Colorado. CHATHAM's wife has a Colorado driver's license as well as a vehicle that is registered to her in the state of Colorado.

20.     In their communications, ABILENE and CHATHAM talked about their respective wives finding photos on their phones and having to delete it. The following conversation was had on January 16, 2023 between ABILENE and CHATHAM:

ABILENE: As far as the wives and stepdaughter's, I've got hundreds of both. Whatever you want to send, I'll reciprocate with something similar. Maybe sneak in a video call after while lol.

ABILENE: I am rebuilding.  I have a lot but last year my wife discovered some pics that she didn't know existed..and was pissed off to no end. So I burned down some files.. lost most of everything.

CHATHAM: I had a similar experience. Mine was pissed too

CHATHAM indicated he had external hard drives that he kept in his basement office, and described how he kept the external harddrive disconnected from wifi, and advised he intended to transfer images and videos to his phone. CHATHAM also spoke about an electric shaver with a hidden camera that he used to record his step-daughter in the bathroom.

9

21.     On or about March 11, 2024, Agents discovered a portion of a conversation between CHATHAM and ABILENE on January 18, 2023, regarding CHATHAM's nieces. ABILENE began the conversation about his 11-year-old daughter. The following information ensued:

CHATHAM: Ever enjoy feeling her up yet?

ABILENE: Yeah, but I do it in an innocent, nonchalant way and she doesn't flinch

CHATHAM: Good sign

CHATHAM: I do the same to my nieces

ABILENE: Me too

CHATHAM: No pics yet

CHATHAM: But they love me and sit with me to watch cartoons

ABILENE: We're the Percy uncles everyone talks about at family reunions. If they only knew…

ABILENE: Pervy

ABILENE: No pics yet?

CHATHAM: Rub their legs softly and eventually down to their pussys. One niece opens her legs when I get close.. just lays her head back and watches tv while in softly massage her pussy.. like nothing is happening

CHATHAM: None

22.     After further investigation, it was discovered CHATHAM has three nieces that appear to be under the age of 6 that live in Liberal, Kansas approximately 10 minutes away from CHATHAM's residence. It is believed these are the nieces CHATHAM refers to in his conversation with ABILENE on January 18, 2023.

## CHARACTERISTICS COMMON TO INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

23.     Based upon my knowledge, experience, and training in child exploitation and child

sexual abuse material (CSAM) investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals with a sexual interest in children. These characteristics particularly apply to individuals involved in receiving, possessing, or distributing child pornography online, including those accessing websites whose primary content is child pornography or child sexual abuse material. These common characteristics include that the individuals:

a. Individuals who seek, collect, and trade child pornography typically have a sexual interest in children and receive sexual gratification from viewing children engaged in sexual activity or in sexually suggestive poses, or from literature describing such activity.

b. These individuals may collect or view sexually explicit or suggestive materials, in a variety of media, including in hard copy and/or digital formats. These individuals oftentimes use these materials for their own sexual arousal and gratification. They may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse or groom a child to participate in sexual activity, or to demonstrate desired sexual acts to a child. They may also use toys, games, costumes, sexual clothing, sexual paraphernalia, and children's clothing to lure or entice children. They may keep "trophies" or mementos of sexual encounters with children, or items that they use to gratify a sexual interest in children, such as by collecting children's underwear or other items belonging to a child.

c. These individuals may take photographs that either constitute child pornography or indicate a sexual interest in children (such as upskirt photos), and may do so by using cameras, video cameras, web cameras, and cellular telephones. Such images and videos may be taken with or without the child's knowledge. This type of material may be used by the person to gratify a sexual interest in children.

d. These individuals maintain their collections in a safe, secure, private, and accessible environment, frequently making use of digital devices. However, many child pornographers make use of hard-copy printed material. Both digital and hard copy format child pornography is usually hidden so that the material is not found by other members of the residence or by anyone who might enter the home. Such hiding places could include but are not limited to garages, sheds, attics, vehicles, bags, and pockets. Digital files and devices may be password protected, encrypted, or otherwise protected.

e. These individuals often maintain their collections of child pornography and other materials indicating a sexual interest in children for a long period of time— commonly over the course of several years. These collections are also frequently

maintained despite changes in residence or the acquisition of different or newer computer devices.

f.    Many of these individuals correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, screen names, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child sexual exploitation. Such correspondence may take place, for example, through online bulletin boards and forums, Internet-based chat messaging, email, text message, video streaming, letters, telephone, and in person. In some cases, these individuals may have joint involvement in child sexual exploitation activities with others within their household or with whom they share a close relationship (e.g., brothers/siblings dating partners, or coworkers).

24.    In this instance, both ABILENE and CHATHAM appear to share many characteristics of individuals who have a sexual interest in children. As demonstrated above, CHATHAM has engaged in communication with another individual, ABILENE, who has an apparent interest in children. ABILENE's initial chats indicate CHATHAM was vetted by another individual known to ABILENE, indicating that CHATHAM had been involved with another offender who shared his and ABILENE's mutual interest in child sexual abuse material. That is all consistent with the characteristic of seeking like-minded individuals for trade and/or validation, making it likely that the devices of CHATHAM will contain evidence of child pornography, deriving from CHATHAM's, ABILENE's and other's criminal sexual exploitation of children.

25.    Additionally, the chats show that CHATHAM has received images and videos depicting child sexual abuse material from ABILENE, which he understood had been produced by ABILENE. The fact that CHATHAM was vetted by another individual, for providing personally produced child pornography, suggests that CHATHAM has previously engaged with others in similar conduct. Again, this makes it likely that the devices of CHATHAM will contain evidence of child pornography, deriving from CHATHAM's, ABILENE's and other's criminal sexual exploitation of children.

26.     CHATHAM also discussed his sexual abuse of his nieces, and indicated his intention (in January 2023) to capture depictions involving his nieces - he advised "no pics yet" in his chat with ABILENE. This content indicates CHATHAM harbors an abiding sexual interest in children, as well as child pornography. This content makes it likely that the devices of CHATHAM will contain evidence of CHATHAM's criminal sexual exploitation of children, including communications with others about strategies for grooming the child prior to producing depictions of child sexual abuse and exploitation.

27.     Along with receiving child sexual abuse material, CHATHAM communicated with ABILENE on Threema which is known to be an end-to-end encryption instant messaging chat platform. This platform is designed to disguise users' communication and/or identification. Additionally, CHATHAM advised he has maintained an external hard drive in his basement to avoid detection by his wife. These efforts to avoid detection are consistent with the characteristics of child pornography offenders.

28.     Based on the content of the chat communications, both CHATHAM and ABILENE demonstrate several of the above characteristics, making it more probable that evidence of their involvement in child sexual abuse/exploitation material will be found on devices at CHATHAM'S residence (TARGET RESIDENCE). Likewise, it is likely that CHATHAM's devices contains evidence of others' involvement in child sexual abuse/exploitation material, given his apparent involvement with like-minded offenders beyond ABILENE.

29.     As referenced in paragraph 23(d), subjects with a sexual interest in children often contain or hide their collections to keep them safe and out of view of others who may enter their home. Subjects may even use a garage to hide material or activity from unsuspecting family

13

members. In this case, CHATHAM has indicated his wife has previously caught him, such that he

has likely employed hiding places at the TARGET RESIDENCE, including the garage.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

30.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the TARGET RESIDENCE, in whatever form they are

found. One form in which the records are likely to be found is data stored on a computer's hard

drive or other storage media. Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all under

Rule 41(e)(2)(B).

31.     I submit that if a computer or storage medium is found in the TARGET

RESIDENCE, there is probable cause to believe evidence, data, or records referenced above will

be stored on that computer or storage medium, for at least the following reasons:

a.     Deleted files, or remnants of deleted files, may reside in free space or slack space
that is, in space on the storage medium that is not currently being used by an active
file- for long periods of time before they are overwritten. In addition, a computer's
operating system may also keep a record of deleted data in a "swap" or "recovery"
file.

b.     Based on my knowledge, training, and experience, I know that computer files or
remnants of such files can be recovered months or even years after they have been
downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic
files downloaded to a storage medium can be stored for years at little or no cost.
Even when files have been deleted, they can be recovered months or years later
using forensic tools. This is so because when a person "deletes" a file on a
computer, the data contained in the file does not actually disappear; rather, that data
remains on the storage medium until it is overwritten by new data.

c.     Wholly apart from user-generated files, computer storage media-in particular,
computers' internal hard drives--contain electronic evidence of how a computer has
been used, what it has been used for, and who has used it. To give a few examples,
this forensic evidence can take the form of operating system configurations,
artifacts from operating system or application operation, file system data structures,
and virtual memory "swap" or paging. Computer users typically do not erase or

14

delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

32.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET RESIDENCE because:

   a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

   b.    Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the

computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

33.     I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and as a storage medium for evidence of the crime. The computer is an

16

instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of internet discussions about the crime; and other records that indicate the nature of the offense.

34.     Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.     Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search website all the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b.     Searching computer systems requires the use of precise, scientific procedures that are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a

complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.

e.    In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.

For these reasons, a substantial amount of time is usually necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

35.    Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime including, for example, serving as the instrument through which the perpetrator of the Internet

18

based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

36.     Based on the foregoing, and consistent with Rule 4l(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

37.     Because CHATHAM is known to be married, with step-children as well as nieces, it is possible that the TARGET RESIDENCE will contain computers or other electronic storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. **If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those devices, the warrant applied for would permit the seizure and examination of those items as well.** Law enforcement may search anywhere within the TARGET RESIDENCE where the evidence listed in ATTACHMENT B may be found, including digital devices.[4] Along with search and seizure, this warrant authorizes the investigating

---

[4] *See, e.g., United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the

agents to conduct forensic triage or on-scene examination of devices to determine if a given device

may be released, and allows them to release devices which they determine do not contain evidence

listed in ATTACHMENT B.

## BIOMETRIC ACCESS TO DEVICES

38.     This warrant also seeks permission for law enforcement to compel CHATHAM, if

found present at the TARGET RESIDENCE, to unlock any DEVICES requiring biometric access

subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing

---

object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.")

camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

21

39.     Due to the foregoing, and because it is probable that CHATHAM is the individual engaged in the aforementioned criminal activity, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of CHATHAM, if found present at the TARGET RESIDENCE, to the fingerprint scanner of the device(s) found at the TARGET RESIDENCE; (2) hold the device(s) found at the TARGET RESIDENCE in front of the face of CHATHAM, if found present at the TARGET RESIDENCE, to activate the facial recognition feature; and/or (3) hold the device(s) found at the TARGET RESIDENCE in front of the of CHATHAM, if found present at the TARGET RESIDENCE, to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel the individuals found at the TARGET RESIDENCE, including CHATHAM, to state or otherwise provide the password or any other means that may be used to unlock or access the device(s). Moreover, **the proposed warrant does not authorize law enforcement to compel the individuals present at the TARGET RESIDENCE to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device(s), without first obtaining a waiver of that individual's Miranda rights**.

## CONCLUSION

40.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the TARGET RESIDENCE described in Attachment A. I respectfully request that this Court issue a

search warrant for the location described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

41.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the TARGET RESIDENCE, and devices located therein, will contain evidence of violations of Title 18 U.S.C. §§ 2251, 2252 and 2252A. Further, I submit that such evidence, listed in Attachment B to this affidavit, constitutes contraband, the fruits of crime, things otherwise criminally possessed, or property, which is or has been used as the means of committing the foregoing offenses.

42.    I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

43.    Therefore, I respectfully request that the attached warrant be issued authorizing the search and seizure of the location identified in Attachment A for the items listed in Attachment B.

Respectfully submitted,

Brittany A. Bayles, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this __22nd__ day of March, 2024

HONORABLE BROOKS G. SEVERSON
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A

### Property to Be Searched

The property to be searched is 219 W 5th Street, Liberal, Kansas 67901, further described as follows: The residence is located on the northeast corner of 5th Street and Sherman Avenue. The residence is a two-story home with light-colored siding, a brown front door, red shutters, and a gray/brown roof. The front door is located on the south side of the residence with a recessed front door. The numbers "219" are affixed to the right of the front door. The driveway is located on the east side of the residence with an unattached two-car garage. The unattached two-car garage resembles the color of the house with a basketball board above the garage door. Photographs of the residence are attached.







2

## ATTACHMENT B

Property to be seized

1.      Any and all child pornography (as defined in 18 U.S.C. § 2256(8)), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica, in any format or media, including computer files, prints, negatives, drawings, and paintings.

2.      Any and all computer devices (including desktops, laptops, tablets, smartphones, as well as the hardware, peripherals, software, computer related documentation, passwords and data security devices, and storage devices), including the software or programs or applications contained therein, that may be or are used to:

    a.      produce, distribute, receive, possess or access child pornography or visual depictions of minors engaged in sexually explicit conduct;

    b.      seek, obtain, store, or record information pertaining to the sexual exploitation of children or otherwise relate to an interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children;

    c.      communicate with any other person regarding child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children; and

    d.      any and all data or information on the device which may relate to subparagraphs 2a, 2b, and 2c, including data or information that may reveal indicia of ownership, access, or use.

3.      Any and all notes, documents, records, correspondence, in any format and media (including, but not limited to, envelopes, letters, papers, diaries, manifestos, manuals, email messages, chat logs and electronic messages, and handwritten notes) pertaining to child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children, and to include any and all data or records that may reveal indicia of creation, use, or ownership of the notes, documents, records, or correspondence.

4.     Any and all notes, documents, records, correspondence, in any format and media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) pertaining to the operation of accounts, including but not limited to Threema and Kik, for the purpose of accessing, receiving, trading, distributing, or producing child pornography.

5.     Any and all cameras, film, videotapes, or other photographic equipment, which may be used to contain, create, or duplicate child pornography, visual depictions of minors engaged in sexually explicit conduct, or child erotica, including any devices or items (such as the disguised electric shaver recording device referenced in the attached affidavit) that appear to have a disguised camera within the body of the item or disguised storage capacity, and including any notes, documents, records, correspondence relating to the purchase, operation, usage, or ownership of the same.

6.     Any and all documents, records, or correspondence, in any format or media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the TARGET RESIDENCE described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

7.     Any and all records, documents, invoices, and materials, in any format or media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

8.     Any and all records, documents, invoices and materials, in any format or media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic

2

messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

9.      Any and all records, documents, invoices, and materials, in any format or media (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern encryption, deletion, or destruction of evidence.

10.     Any and all visual depictions of minors that may assist in the identification of minors depicted in images of child erotica or child pornography.